**Andrew Dean**
**Osman Nawaz***
**Joshua Brodsky**
**Preethi Krishnamurthy**
**Alistaire Bambach**
**Neal Jacobson**
**Zachary Sturges**
**Ariana Torchin**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**100 Pearl Street**
**Suite 20-100**
**New York, New York 10004**
**(212) 336-0095 (Jacobson)**
**Email: Jacobsonn@sec.gov**
**\*Not admitted to U.S. District Court for the S.D.N.Y.**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>Plaintiff,<br><br>-against-<br><br>**INFINITY Q CAPITAL MANAGEMENT, LLC,**<br><br>Defendant,<br><br>-and-<br><br>**WILDCAT PARTNER HOLDINGS, LP,**<br><br>Relief Defendant. | **COMPLAINT**<br><br>**23-Civ. ____ (   )**<br><br>**ECF CASE**<br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission ("SEC"), for its Complaint against

Defendant Infinity Q Capital Management, LLC ("Infinity Q" or "Defendant"), and Relief

Defendant, Wildcat Partner Holdings, LP ("WPH") (F/K/A Bonderman Family Limited

Partnership), against which the SEC seeks to recover distributions made to it by Infinity Q, alleges as follows:

## SUMMARY

1.     SEC-registered investment adviser Infinity Q engaged in a fraudulent scheme that inflated by more than $1 billion the value of assets held by a mutual fund (the "Mutual Fund") and a hedge fund (the "Private Fund") Infinity Q advised (collectively, the "Infinity Q Funds" or the "Funds").

2.     Infinity Q's fraudulent scheme was conducted through acts committed by James Velissaris ("Velissaris"), Infinity Q's founder and former chief investment officer ("CIO"), who pleaded guilty to securities fraud in connection with the scheme on November 21, 2022 and was sentenced to 180 months imprisonment on April 7, 2023.

3.     From at least February 2017 through February 2021 (the "Relevant Period"), Infinity Q represented to investors and others that certain holdings of the Infinity Q Funds were valued by an "independent" third party pricing service (the "Pricing Service"). In fact, Infinity Q was actively manipulating the valuation models available from the Pricing Service and altering inputs to mask the poor performance of the Funds.

4.     Unbeknownst to investors, Infinity Q knowingly inflated the Funds' stated valuations in at least four ways during the Relevant Period. Infinity Q manipulated computer code to cause the valuation models to disregard certain information, entered inputs it knew were incorrect into the Pricing Service, selected certain valuation models in the Pricing Service that it knew could not properly value the relevant positions, and knowingly cherry-picked one of the key valuation inputs.

5.      Despite inflating the Infinity Q Funds' valuations by manipulating the Pricing Service, Infinity Q repeatedly told investors, the Mutual Fund's board of trustees (the "Board"), and the Funds' auditor during the Relevant Period that Infinity Q had no role in the Pricing Service valuation process, that the Pricing Service and the values it produced were independent from Infinity Q, and that the Infinity Q Funds' administrator (the "Administrator") obtained values directly from the Pricing Service with no Infinity Q involvement.

6.      Infinity Q's pricing manipulations materially inflated the Mutual Fund's net asset values ("NAVs") and the Private Fund's total assets, as well as the Funds' reported performance, and Infinity Q disseminated false and misleading information about the Infinity Q Funds' valuations, performance, and investment terms to investors.

7.      Infinity Q's manipulations of the Funds' valuations were pervasive. At times, Infinity Q had different valuations for the same position held by different Funds, and the Mutual Fund reported positions at mathematically impossible valuations. Infinity Q was also aware that the Funds' counterparties were valuing the very same positions at massively different amounts.

8.      By March 2020, when faced with market volatility caused by the COVID-19 pandemic, Infinity Q knew that its Funds were poorly positioned for increasing market turmoil and that they were at risk of failing. Infinity Q sought a $100 million cash infusion from affiliates of its partial owner, but the proposed loan was never made. In response and to try to stave off the Infinity Q Funds' failure, Infinity Q stepped up the manipulation of the valuations of positions held by the Funds, resulting in the overvaluation of the Funds' net assets by hundreds of millions of dollars, as much as 42% in the Mutual Fund and 137% in the Private Fund. This overvaluation attracted hundreds of millions of dollars in additional investments and forestalled investor redemptions, all while some funds with similar investment strategies struggled or failed.

9.      As of the end of March 2020, as a result of Infinity Q's mismarking, Infinity Q reported year-to-date returns for institutional class shares in the Mutual Fund of 8.95%, one-year returns of 10.61%, three-year returns of 8.72%, and five-year returns of 7.28%. By contrast, the Infinity Q's principal benchmark—a hedge fund index—reported year-to-date returns of  -8.98% (that is, a loss of 8.98%), one-year returns of -4.32%, three-year returns of 0.36%, and five-year returns of 0.24%.

10.      Meanwhile, Infinity Q tried to conceal the mismarking scheme, including from the Infinity Q Funds' independent auditor. For example, in connection with the Infinity Q Funds' audits, Infinity Q forged transaction confirmation documents by changing the actual transaction terms in order to deceive the auditor into thinking that the Funds' valuations were reasonable.

11.      By September 2020, Infinity Q's fraudulent scheme had resulted in an overvaluation of the Infinity Q Funds by over $1 billion.

12.      By February 2021, when Infinity Q removed Velissaris from its management, the Infinity Q Funds remained overvalued by at least hundreds of millions of dollars.

13.      As a result of the Infinity Q Funds' overvaluation, Infinity Q received management and performance fees to which it was not entitled.

## VIOLATIONS

14.      By virtue of the foregoing conduct and as alleged further herein:

a.      Infinity Q violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], Sections 204(a), 206(1), 206(2), 206(4) and 207 of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-4(a), 80b-6(1), 80b-6(2), 80b-6(4), and 80b-(7)], and Rules 204-2(a), 206-4(7),

and 206(4)-8 thereunder [17 C.F.R. §§ 275.204-2(a), 275.206(4)-7, and 275.206(4)-8], and

Section 34(b) of the Investment Company Act of 1940 ("Investment Company Act") [15 U.S.C.

§§ 80a-33,], and aided and abetted violations of Rule 22c-1 under the Investment Company Act

[17 C.F.R. § 270.22c-1].

16.     Unless Infinity Q is restrained and enjoined, it will engage in the acts, practices,

transactions, and courses of business set forth in this Complaint or in acts, practices, transactions,

and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

16.     The SEC brings this action pursuant to the authority conferred upon it by Section

20(b) of the Securities Act [15 U.S.C. §§ 77t(b)], Section 21(d) of the Exchange Act [15 U.S.C.

§ 78u(d)], Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)], and Section 42(d) of the

Investment Company Act [15 U.S.C. § 80a-41(d)].

17.     The SEC seeks a final judgment: (a) permanently enjoining Infinity Q from

violating the federal securities laws and rules this Complaint alleges it has violated; (b) ordering

Infinity Q to disgorge all ill-gotten gains it received as a result of the violations alleged herein

and to pay prejudgment interest thereon; (c) ordering Infinity Q to pay civil money penalties

pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d) of the

Exchange Act [15 U.S.C. § 78u(d)], Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)],

and Section 42(e) of the Investment Company Act [15 U.S.C. § 80a-41(e)]; (d) ordering the

appointment of an independent Monitor to oversee a claims and distribution process for the

Private Fund; and (e) ordering any other and further relief the Court may deem appropriate or

necessary for the benefit of investors.

18.     The SEC also seeks a final judgment ordering WPH to pay disgorgement and prejudgment interest.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27 of the Exchange Act [15 U.S.C. § 78aa], Section 214 of the Advisers Act [15 U.S.C. § 80b-14], and Section 44 of the Investment Company Act [15 U.S.C. § 80a–43].

20.     Infinity Q has, directly and indirectly, made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

21.     Venue lies in this District under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27 of the Exchange Act [15 U.S.C. § 78aa], Section 214 of the Advisers Act [15 U.S.C. § 80b-14], and Section 44 of the Investment Company Act [15 U.S.C. § 80a–43]. Certain of the acts, practices, transactions, and courses of business alleged occurred in this District, where Infinity Q had its offices during the Relevant Period, and at least one of Infinity Q's victims has its principal place of business in this District.

## DEFENDANT

22.     **Infinity Q Capital Management, LLC** is a registered investment adviser headquartered in New York, New York. Infinity Q was organized as a Delaware limited liability company in 2014. Infinity Q's principal owners are Infinity Q Management Equity, LLC (60%) and WPH (40%). Infinity Q Management Equity, LLC, is owned 85% by Velissaris and 15% by Scott Lindell. Infinity Q advised the Mutual Fund, the Infinity Q Diversified Alpha Fund mutual fund (Ticker: IQDNX), and the Private Fund, the Infinity Q Volatility Alpha Fund, L.P.

**RELIEF DEFENDANT**

23.    **Wildcat Partner Holdings, LP (F/K/A Bonderman Family Limited Partnership)** is a family limited partnership that owns 40% of Infinity Q, and which received distributions from Infinity Q on account of its investment in Infinity Q.

**RELATED INDIVIDUAL AND ENTITIES**

24.    **James R. Velissaris**, age 38, was the founder and CIO of Infinity Q and majority owner of Infinity Q Management Equity, LLC, which was the majority owner of Infinity Q. On February 17, 2022, the Commission charged and the Department of Justice unsealed an indictment against Velissaris for his role in the fraudulent scheme. On November 21, 2022, Velissaris pleaded guilty to one count of securities fraud in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and on April 7, 2023, he was sentenced to 180 months imprisonment.

25.    **Scott Lindell**, age 44, was the chief compliance officer ("CCO"), chief risk officer, head of operations, and a portfolio manager of Infinity Q. Lindell is also a minority owner of Infinity Q Management Equity, LLC, which is an owner of Infinity Q. On October 6, 2022, the U.S. District Court for the Southern District of New York enjoined Lindell, on consent, from violations of certain provisions of the federal securities laws.

26.    An audit, accounting, advisory, and consulting firm (**the "Auditor"**) served as the Mutual Fund's and the Private Fund's auditor since 2018.

# FACTS

## I.   Background

### A.  Mutual Funds, Private Funds, and Investment Advisers

#### 1.  Mutual Funds

27.     A mutual fund is a type of SEC-registered investment company, or series thereof. Investment companies pool money from many investors and invest the money in stocks, bonds, short-term money-market instruments, other securities or assets, or some combination of these investments. The combined securities and assets the investment company owns are known as its portfolio. A mutual fund's portfolio is managed by an SEC-registered investment adviser. A mutual fund's investment adviser owes a fiduciary duty to the fund. Each mutual fund share represents an investor's proportionate ownership of the mutual fund's portfolio and the income and capital gains the portfolio generates.

28.     Investors in mutual funds buy their shares from, and sell/redeem their shares to, the mutual funds themselves. Mutual fund shares are typically purchased from the fund directly or through investment professionals like brokers. Mutual funds are required by law to price their shares each business day and they typically do so after the major U.S. exchanges close. This price—the per-share value of the mutual fund's assets minus its liabilities—is called the per share net asset value or "per share NAV." Mutual funds must sell and redeem their shares at the per share NAV that is next calculated after the investor places a purchase or redemption order. This means that, when an investor places a purchase or redemption order for mutual fund shares during the day, the investor will not know what the purchase or redemption price is until the next per share NAV is calculated.

29.     A mutual fund is required under the Investment Company Act to calculate its NAV using the market value of its portfolio securities when market quotations for those securities are "readily available." If a market quote for a security is not readily available, the fair value of that security, as determined in good faith by the fund's board, must be used in order to calculate the NAV. A mutual fund's prospectus, available to investors, often describes its valuation procedures.

30.     Mutual funds must comply with various disclosure requirements under the Investment Company Act and, if they publicly offer shares, the Securities Act. For example, Sections 30(a), (b), and (e) of Investment Company Act, and rules adopted thereunder, require registered investment companies to file and/or transmit annual and semiannual reports to their shareholders. Such shareholder reports generally must include portfolio holdings information and more detailed financial statements than registration statements.

### 2.   Private Funds

31.     Other investment pools may rely on one of the exclusions from the definition of investment company set forth in Section 3 of the Investment Company Act. Investment pools that rely on the exclusions set forth in Section 3(c)(1) and Section 3(c)(7) of the Investment Company Act[1] are often referred to as "private funds." Some private funds are commonly known as "hedge funds."

32.     Like mutual funds, private funds pool investors' money and invest the money in

---

[1] Section 3(c)(1) excepts from the definition of investment company any issuer whose outstanding securities (other than short-term paper) are beneficially owned by not more than one hundred persons and that is not making and does not at that time propose to make a public offering of such securities. Section 3(c)(7) excepts from the definition of investment company any issuer whose outstanding securities are owned exclusively by persons who, at the time of acquisition of such securities, are qualified purchasers and that is not making and does not at that time propose to make a public offering of such securities. The term "qualified purchaser" is defined in Section 2(a)(51) of the Investment Company Act.

an effort to make a positive return.

33.     Private funds are not subject to some of the regulations applicable to mutual funds. Private funds, however, and their advisers, are subject to the same prohibitions against fraud as are other market participants, and, like investment advisers to mutual funds, investment advisers to private funds owe a fiduciary duty to the funds that they manage and are also subject to anti-fraud prohibitions with respect to the private fund's investors and prospective investors.

34.     A private fund often discloses its valuation procedures in communications with investors or prospective investors.

35.     Whereas the mutual fund advisory fee structure is often based on a percentage of assets under management, the private fund advisory fee structure typically includes both a management fee (based on assets under management) and a performance fee (based on the profits of the fund).

### 3.   Investment Advisers

36.     An investment adviser, under the Advisers Act, is any person that, for compensation, engages in the business of providing investment advice to others, including a mutual fund or private fund, about the value of or about investing in securities. Advisers that manage portfolios provide ongoing advice about buying, selling and/or holding investments and, in the context of an ongoing advisory relationship with a client and unless agreed otherwise, will monitor the performance of the client's investments and their alignment with the client's overall investment objectives and best interest.

### B.   Derivatives and Variance Swaps, Generally

37.     Derivatives are financial instruments whose performance is derived, at least in part, from the performance of an underlying asset, security, or index, among other things.

38.     Over-the-counter ("OTC") derivatives are contracts that are privately negotiated between two counterparties without going through an exchange.

39.     A swap is a type of derivative in which two counterparties agree to exchange or "swap" payments with each other as a result of such things as changes in a stock price, interest rate, commodity price, or even the volatility or variance of a financial instrument.

40.     Volatility is a measure of the magnitude of price movement, either up or down, of a financial instrument or another financial measure such as an index. Variance is the square of volatility.

41.     Generally, in a variance swap, at the time of the expiration of a position, the buyer of the swap receives the amount of realized variance (*i.e.*, the square of the realized volatility) over a certain period, subject to certain conditions, multiplied by a notional dollar amount, if that amount of realized variance is above the initially agreed upon price level (known as the strike price). If the amount of realized variance is below the initially agreed upon level determined by the strike price, then the buyer of the swap must pay the seller the difference.

### C.   Infinity Q and the Infinity Q Funds

42.     In approximately 2014, Velissaris, having worked at several well-known asset managers and a prominent family office, sought to strike out on his own and started Infinity Q with the goal of putting into practice his own investment approach.

43.     Infinity Q is an investment adviser within the meaning of Section 202(a)(11) of the Advisers Act, 15 U.S.C. § 80b-2(a)(11) and has been registered as an investment adviser with the SEC since May 6, 2014.

44.     Velissaris is also an investment adviser within the meaning of Section 202(a)(11) of the Advisers Act. As the founder, indirect majority owner, and CIO of Infinity Q, Velissaris

had control over the firm, and his actions and state of mind are imputed to Infinity Q. Velissaris also acted as an investment adviser to the Infinity Q Funds in his individual capacity and received compensation for his services through the management fees paid by the Infinity Q Funds. Velissaris was promoted on Infinity Q's website and other marketing materials as the CIO of Infinity Q and held himself out as being in the business of advising the Infinity Q Funds on investing in securities. Velissaris was also primarily responsible for hiring Infinity Q personnel.

45.     Infinity Q and Velissaris, as investment advisers to the Infinity Q Funds, owed a fiduciary duty to the Infinity Q Funds.

46.     At all relevant times through at least February 21, 2021, the date that he was placed on administrative leave, Velissaris was responsible for all investment decisions of Infinity Q.

47.     During the Relevant Period, Infinity Q offered two main products, which held the majority of the assets advised by Infinity Q: (a) the Mutual Fund (launched in 2014); and (b) the Private Fund (launched in 2017).

48.     Through its Mutual Fund, Infinity Q sought to attract retail investors. The Mutual Fund had thousands of investors, including at least one investor located in this District.

49.     Through its Private Fund, Infinity Q sought to attract institutional investors, which included public pension funds, university endowments, and charitable foundations, among others. The Private Fund had over 150 investors, including at least one investor located in this District.

50.     Infinity Q represented in marketing materials that it offered retail investors "access to the top tier investment strategies typically reserved for elite high net worth clients."

51.     Infinity Q further represented to investors in both the Mutual Fund and the Private Fund that its "mandate" was "to provide positive absolute returns while having full liquidity and low average correlation to equity and credit markets."

52.     The Mutual Fund's and the Private Fund's portfolios consisted primarily of cash and a variety of equity and derivative positions, including swaps. The swaps held by the Infinity Q Funds were predominately variance swaps, the value of which was tied to measures of volatility.

53.     Velissaris operated as the head trader at Infinity Q and was one of three members of the Infinity Q valuation committee. In practice, there were no formal valuation committee meetings since at least approximately 2018. Velissaris was the sole decision-maker at Infinity Q for the valuation of the Mutual Fund's and the Private Fund's positions.

## II.     Infinity Q's Purported Valuation Process

### A.  Valuation Policies and Use of Pricing Service

54.     In order to price the OTC derivative positions that constituted a significant portion of the Funds' assets, Infinity Q through Velissaris, starting in approximately 2016, identified, retained, and started using the Pricing Service—a well-known premium service that marketed itself as providing a comprehensive platform to structure and price derivatives, among other complex financial instruments.

55.     By 2017, the Infinity Q Funds' administrator (the "Administrator") directly accessed from the Pricing Service the values generated through Velissaris's use of the Pricing Service and used the reported values to calculate and publish the Mutual Fund's daily NAV and to calculate the Private Fund's monthly profit and loss report.

56.     In offering documents, prospectuses, valuation policies, and other documents,

Velissaris and Infinity Q represented to the Funds' current and prospective investors how they would value the Funds' assets, including how they would seek to "fair value" assets and use an independent pricing service.

57.     For example, Infinity Q represented that Infinity Q Funds' assets were valued in accordance with U.S. Generally accepted Accounting Principles ("GAAP").

58.     Accounting Standards Codification Topic 820 ("Topic 820"), Fair Value Measurement, provides a framework for determining fair value in accordance with GAAP.

59.     Topic 820 defines fair value (with the emphasis in the original) as "the price at which an orderly transaction to sell the asset or to transfer the liability would take place between market participants at the measurement date under current market conditions (that is, an *exit price* at the measurement date from the perspective of a market participant that holds the asset or owns the liability)."

60.     Infinity Q further represented to current and prospective investors in the Mutual Fund that Infinity Q and the Board of trustees (the "Board") had established valuation policies and procedures to purportedly "fair value" portfolio holdings in accordance with the Infinity Q Funds' offering documents.

61.     In the Mutual Fund's 2017 and 2018 prospectuses, for example, Infinity Q represented that "[w]hen market quotations are not readily available, a security or other asset is valued at its fair value as determined under procedures approved by the Board."

62.     In the Mutual Fund's prospectus dated December 31, 2019, for example, Infinity Q represented:

> Generally, the Fund's investments are valued at market value or, in the absence of a market value, at fair value as determined in good faith by [Infinity Q] with oversight by the [valuation committee of the Trust] pursuant to procedures approved by or under the direction of the Board.

> Pursuant to those procedures, [Infinity Q] considers, among other things:
> (1) the last sales price on the securities exchange, if any, on which a
> security is primarily traded; (2) the mean between the bid and asked
> prices; (3) price quotations from an approved pricing service; and (4) other
> factors as necessary to determine a fair value under certain circumstances.

63.     Many of the Infinity Q Funds' OTC derivative positions, which constituted a

significant portion of the Funds, did not have readily available market prices. While the

settlement values of such positions are generally agreed upon by the parties at termination (*i.e.*,

because at that point volatility is fully realized, or known, to the parties), the Mutual Fund still

needed to value its OTC derivative positions on a daily basis to calculate the Mutual Fund's

NAV, and the Private Fund needed to value the positions on at least a monthly basis to determine

its profit and loss report. As a result, Infinity Q's valuation process would play a critical role in

valuing these positions prior to their termination.

64.     The Infinity Q valuation policy was contained in its compliance manual and in the

Private Fund private placement memorandum ("PPM") that Infinity Q sent to and used to raise

funds from investors, from 2017 through May 2020.[2] In its valuation policy, Infinity Q stated

that it utilized "independent sources, such as brokers or pricing services" to value the Private

Fund's positions.

65.     For the OTC derivatives held by the Private Fund, the Infinity Q valuation policy

further represented prior to May 2020, when Velissaris surreptitiously revised the policy, that it

"utilizes [the Pricing Service], Broker Quotes, and Counterparty Valuations to provide a fair

value for these securities."

66.     The Infinity Q valuation policy further provided prior to May 2020, when

---

[2] Generally, a PPM is an offering document that introduces the investment and discloses information about the
securities offering and the issuer.

Velissaris surreptitiously revised the policy,  that "[a]t each month end, valuations are compared to the values provided by counterparties for reasonableness," and that "[o]nce a price is established for a portfolio security, it shall be used for all Funds that hold the security."

67.     In its 2019 compliance manual, Infinity Q stated that it utilized "[p]ricing services and broker dealers" in an "attempt to obtain a minimum of two independent prices" when trying to "determine the fair value of the instrument," and "[t]he final price for each position is typically obtained by calculating the average of the external prices received." The policy further stated that "[w]hen multiple independent marks are available, Infinity Q does not mark any securities higher than the average of the prices obtained." To the extent the pricing service or broker quotes "may not provide a reliable indication of fair value, Infinity Q will value such [p]osition based on relevant information," including internal or external models or other appropriate factors. In these circumstances, "[a] written valuation memo/model shall be provided for model-based prices explaining why the price used reflects fair value of the [p]osition," unless the position had "nominal value." These provisions were also altered when Velissaris surreptitiously revised the Infinity Q valuation policy in May 2020.

68.     In the Mutual Fund's 2019 and 2020 annual reports and semi-annual reports, Infinity Q further represented that the Mutual Fund "uses a pricing service to model price the variance swap trades" and that the Pricing Service "uses quotes from brokers to estimate implied volatility levels as an input to these models."

69.     In its required reporting on private funds on Form ADV for 2017 through 2020, Infinity Q represented that 100% of the Private Fund's assets were valued by a person who was

not a "related person" of Infinity Q.[3]

70.     In or around March 2018, Velissaris was asked to review a draft of Infinity Q's Form ADV, which contained the statement that 100% of the Private Fund's assets were valued by a person who was not a "related person" of Infinity Q. On March 29, 2018, Velissaris replied by email to that request and wrote: "Looks great. I have no updates." After Velissaris's sign-off, the Form ADV was submitted the same day.

**B.   Infinity Q, through Velissaris, Makes Additional Representations About Infinity Q's Valuation Process**

71.     Velissaris and others at Infinity Q repeatedly referred to Pricing Service-generated valuations as "independent" prices in communications with, among others, investors, the Board, and the Auditor.

72.     For example, in response to an August 2016 Board inquiry about Infinity Q's use of the Pricing Service to price OTC derivatives, Velissaris explained that Infinity Q "provide[s] the term sheet, and [the Pricing Service] created the pricing model. We have not had any input into [the Pricing Service's] models, and they independently provide the values. [The Pricing Service] also provided the code for the model at the onset for us to have a full understanding of the methodology."

73.     In other correspondence with the Board in October 2016, Velissaris claimed that the Mutual Fund's "positions were valued independently by [the Pricing Service] team," and "[w]e were not involved in the valuation process."

74.     In April 2018, Velissaris edited a draft response for the CCO to send to

---

[3] Form ADV is the uniform form used by investment advisers to register with both the SEC and state securities authorities.

representatives of the Administrator, who had inquired about Infinity Q's valuation process. The draft response, after Velissaris's edits, represented: "Infinity Q does not price any securities ourselves. Prices are either provided by [the Pricing Service] directly to [the Administrator] for non-vanilla OTC instruments or we forward [Pricing Service] values to [the Administrator] for positions not requiring [Pricing Service] valuation." This response was then sent by the CCO to representatives of the Administrator with Velissaris copied. Representatives of the Administrator replied to the CCO, with Velissaris copied, that the approach was acceptable to them as long as Infinity Q was "complete and thorough in your summary." The Administrator further stated that "anything that is not downloaded directly from [the Pricing Service] is adviser priced even if you use models on [the Pricing Service] to complete the valuations. This is due to Infinity Q still having the ability to change inputs or calibrate any of the models."

75.     In April 2018, Velissaris informed the Auditor that Infinity Q's variance and correlation swaps "are modeled independently by [the Pricing Service] and [the Pricing Service] independently obtains broker implied volatility values (with no input from our team)." In October 2018, Velissaris informed the Auditor that "[t]he [Pricing Service] team uses a stochastic model to price these securities."

76.     Velissaris and Infinity Q also repeatedly told investors and provided them with documents that indicated that Infinity Q had no role in the Pricing Service valuation process, that the Pricing Service was independent from Infinity Q, and that the Administrator obtained values directly from the Pricing Service with no Infinity Q involvement. For example, a 2019 due diligence report prepared by a third-party diligence consultant on behalf of a potential investor in the Private Fund, reported that Infinity Q represented that, "[i]n practice," the Administrator, not Infinity Q, "price[d] the book independently using [the Pricing Service]." According to Infinity

Q, "[w]hen trades are completed, [Infinity Q] sends [the Pricing Service] the details and [the Pricing Service] will model the securities independent of [Infinity Q]," and Infinity Q "do[es] not override [the Pricing Service]." The potential investor subsequently invested in the Private Fund.

77.     Similarly, in May 2020, Velissaris told an investor that "[t]he valuation and reporting for the mutual fund is conducted by [the Administrator]."

## III.    The Mismarking Scheme

78.     The statements made by Velissaris and Infinity Q during the Relevant Period about Infinity Q's valuation process, including about the use of the Pricing Service, were false or misleading. Velissaris knew or recklessly disregarded that he was, in fact, manipulating the valuations of the Infinity Q Funds' positions in the Pricing Service and was able to effectively set the terms and edit computer code to produce valuations of positions at whatever level he desired.

79.     There were three primary steps for Velissaris to price an OTC derivative position held by the Infinity Q Funds through the Pricing Service.

80.     *First*, Velissaris was required to select, from among numerous models available from the Pricing Service, a model appropriate for the position. For example, the Pricing Service offered a basic valuation model for a "vanilla" variance swap and a different model for a "corridor" variance swap, which model would take into account the corridors.

81.     *Second*, upon selecting the appropriate model, Velissaris was required to enter the terms of the transaction, as reflected in the term sheet or confirmation between Infinity Q and the broker-dealer counterparty, into a user interface ("User Interface"). The User Interface for a particular model included fields for the entry of the terms of the transaction. Once the terms were entered into the fields, they then appeared in the Pricing Service's User Interface.

82.     After the terms of the transaction were entered into the available fields of the User

Interface, those terms were automatically mapped, or copied, onto the model's underlying computer code that ultimately calculated a valuation for the position (the "Underlying Valuation Code").

83.     *Finally*, to the extent applicable for the position, Velissaris could select a volatility surface or snapshot from a drop down menu of options available from the Pricing Service. Volatility, which was derived from the volatility surface, was also a key input for many of the OTC derivative positions, a significant portion of the holdings of the Infinity Q Funds.

84.     After these steps were performed, the model's Underlying Valuation Code then calculated a value for the position.

85.     In selecting the appropriate model, the Pricing Service provided guidance to clients, including Velissaris, about the correct model to use for a particular type of derivative position.

86.     For certain OTC derivative transactions, the Pricing Service did not initially have a standard model, and so Pricing Service engineers would sometimes, at a customer's request, derive a custom model to value those positions (a "Custom Model").

87.     Like regular models, Custom Models also allowed a user to enter terms of the swap transaction into fields in the User Interface. For example, a Custom Model for a corridor variance swap model provided entry fields for the position's strike price (a fixed price, determined at the transaction's inception), vega notional (the amount paid per 1 percentage point shift in variance), effective date (when variance begins accruing), termination date (when variance stops accruing), underlying reference asset (typically an index), corridor boundaries (the boundaries within which the reference asset must remain to accrue variance), and "scaling factor" (or "annualization factor, discussed below).

88.     The Underlying Valuation Code for Custom Models was only viewable to a user by clicking on a small box on the User Interface, which would then show the underlying code in a separate window on the user's screen.

89.     Velissaris had the ability to view the Underlying Valuation Code for all Pricing Service models used by the Infinity Q Funds. Velissaris additionally had the ability to both view *and edit* the Underlying Valuation Code in Custom Models that he selected for use by the Infinity Q Funds. The ability to edit the Underlying Valuation Code was not available on the standard models available from the Pricing Service.

90.     To that end, the Pricing Service included a warning at the bottom of the Underlying Valuation Code in the Custom Models, which stated that it was the customer's responsibility to ensure that the code being used matched the terms of the transaction. The warning stated: "(*** This [] script is used as an example for illustration purposes. Clients must make sure that the input parameters entered into the script faithfully represent the term sheet that they would like to price. ***)."

91.     Velissaris saved the initial Custom Models provided by the Pricing Service and reused them to value new positions as they were added to the Infinity Q Funds' portfolios.

92.     Given the functionality of the Pricing Service, Velissaris had the ability to adjust inputs and terms entered into the User Interface's fields on a transaction-by-transaction basis. Velissaris also had the ability to alter the Underlying Valuation Code in the Custom Models in order to price positions at more desirable valuations.

93.     Velissaris's scheme to mismark and inflate the Infinity Q Funds' values included (a) making changes to the Underlying Valuation Code; (b) entering or changing inputs into the Pricing Service models that did not match the terms sheets for the positions; (c) selecting

improper valuation models for positions; and (d) cherry picking a desirable volatility surface for pricing.

94. Through most of 2021, when his scheme began to unravel, Velissaris did not disclose to anyone else at Infinity Q, the Board, the Administrator, the Auditor, or investors the extent to which he had the ability to, and did, manipulate the Pricing Service, including that he was editing the Underlying Valuation Code, such that he could effectively determine valuations for positions himself.

### A. Velissaris Manipulated Underlying Valuation Code

95. Velissaris manually accessed and altered the Underlying Valuation Code of the Custom Models for certain positions, effectively changing the terms of the transactions for valuation purposes.

96. From at least February 2017 through approximately January 2021, Velissaris was the only person at Infinity Q who made any edits or changes to any of the Infinity Q Funds' positions loaded in the Pricing Service.

97. Velissaris knowingly made multiple modifications to the Underlying Valuation Code of the Custom Models. These modifications had the effect of artificially increasing the value of certain of the Infinity Q Funds' variance swap positions as alleged below through at least mid-February 2021, when Infinity Q revoked Velissaris's access to the Pricing Service.

### 1. Alterations to Corridors

98. Generally, corridor variance swaps are derivative products that only pay out if specified index values remain within a "corridor" defined by an upper and lower bound. For example, if a variance swap that references the S&P 500 had corridors of 4,250 and 4,750, it would accrue variance so long as the index remained within that range. If the index, for example,

decreased to 4,249 or increased to 4,751, variance would no longer accrue so long as the index level remained outside of the corridor.

99.     When Velissaris purchased a "long" corridor variance swap from a broker-dealer counterparty, the price paid was determined in part by the corridor boundaries agreed to by the parties—the wider the corridor, the more likely the reference asset would remain in the corridor, and the swap would have a greater pay out.

100.     In this scheme, Velissaris opened and edited the Underlying Valuation Code of the Custom Models used for a number of the Infinity Q Funds' corridor variance swaps. Velissaris's edits included widening or even eliminating the effect of the corridors in the Underlying Valuation Code, and thereby inflating the value of the long corridor variance swaps.

101.     Because the corridor ordinarily limits the payout on those swaps (*i.e.*, variance only accrues to the extent the index remains within the corridor), the effect of these code modifications was to improperly increase the swaps' values for a long position (meaning Infinity Q was the buyer of variance). That is, the wider the corridor, the more likely the index would remain within its boundaries and, as a result, the higher value the Pricing Service would ascribe to the position.

102.     These inflated values were then included in the Mutual Fund's daily NAV and Private Fund's monthly profit and loss report and otherwise disseminated to investors.

103.     When Velissaris made changes to the Underlying Valuation Code, those changes did not automatically map onto the terms entered into and displayed in the User Interface. By proceeding in this manner, the Underlying Valuation Code was actually valuing the position with terms that differed from the terms being displayed in the User Interface.

104.     In some instances, Velissaris improperly altered the Underlying Valuation Code

by writing into the code an additional amount to be added to an upper corridor and/or subtracted from a lower corridor, thus widening the corridors. By widening the corridors for long positions, Velissaris increased the likelihood of the position being in the corridor and thus accruing additional variance, as well as its value for the Infinity Q Funds.

105.    For example, the Private Fund held a certain corridor variance swap that referenced the EURO STOXX 50 index ("SX5E") with a strike price of 16.85%, an effective date of 1/10/20, and a termination date of 12/17/20. The "corridor" for this position was defined as having a lower bound of 2,652.66 and an upper bound of 4,168.47. According to the position's term sheet, the position only accrued variance (that is, payout related to the movement of the SX5E index) for the Private Fund when the price of the index was within the boundaries of the corridor from the effective date to the termination date.

106.    Velissaris edited the Underlying Valuation Code for this position by writing into the code a "-2650" to modify the low corridor parameter, which was reflected in the User Interface as 2650 (already differing from the term sheet lower boundary of 2652.66). As a result of Velissaris's edit to the Underlying Valuation Code, the lower corridor of this position was effectively reduced to zero. As alleged more fully below, when this very position was selected by the Auditor for independent re-valuation by a third-party expert on or about February 2021, Velissaris provided the Auditor with a forged term sheet in an attempt to cover-up and perpetuate his mismarking scheme.

107.    An image of the Underlying Valuation Code for this position (taken in March 2021), as altered by Velissaris, appears below in Figure 1. Velissaris's edit of "-2650" to the position's lower bound ("corridor_low" in the code) appears in line 23 of the Underlying Valuation Code.

**Figure 1: Extracted Image of Private Fund Position in Pricing Service as of March 2021**



108.     Velissaris knew or recklessly disregarded that these alterations were

inappropriate. For example, in April 2020, a risk analyst at Infinity Q sent Velissaris a risk

analysis of all of the Infinity Q Funds' corridor variance swap positions. That analysis indicated

that this position, taking into account the corridors reflected on the term sheet, would be below

the lower bound 34% of the remaining time for the life of the position, meaning that it would not

accrue value for that period. By disregarding the lower bound in the code, then, Velissaris effectively eliminated this possibility and ensured that the position's value would be inflated.

109.    In many instances, Velissaris altered the Underlying Valuation Code to disregard the corridors altogether. For example, the Mutual Fund held a certain corridor variance swap that referenced the SX5E index with a strike price of 17%, an effective date of 12/18/20, and a termination date of 12/16/22. The "corridor" for this position was defined as having a lower bound of 2,333.8 and an upper bound of 3667.4. According to the position's term sheet, the number of "days in range" when the position would accrue variance was defined as when the price of the index was above the lower bound *and* below the upper bound (that is, within the boundaries of the corridor). Velissaris edited the Underlying Valuation Code for this position to replace a coded "and" with a coded "or." After Velissaris's edit, the "days in range" were triggered on any day the underlying index was *either* above the lower bound *or* below the upper bound—effectively, disregarding the corridor entirely. On or about January 15, 2021, after obtaining read-only access to the Infinity Q Funds' portfolios from the Pricing Service, SEC staff identified this particular coding change and simulated the correct valuation by changing the "or" back to an "and" in the code. Using the correct valuation code resulted in a reduction of the value of the position by approximately $5 million.

110.    In other instances, Velissaris altered the Underlying Valuation Code to make worthless positions appear to have value. For example, the Mutual Fund held a certain SX5E index "up" corridor variance swap position with a strike price of 9.7%, an effective date of 1/14/20, and an expiration date of 6/19/20. Pursuant to the terms of this position, variance would only accrue if the index was above the lower bound, which was defined as 3,849.97 (the term sheet did not include an upper bound, which is why it is referred to as an "up" corridor variance

swap). On January 14, 2020, the SX5E index closed at 3,774.88, so the position was out of the money, meaning it was not accruing a payout. However, in the Underlying Valuation Code for this position, Velissaris wrote into the code a "-200," so that for valuation purposes the lower bound became 3,649.97 instead of 3,849.97. The result of this edit was to immediately place the position in the money, meaning it was accruing a payout. Accordingly, when the position was added to the Mutual Fund's portfolio on January 15, 2020, it was marked as having a value of approximately $274,000, and it was listed in the Mutual Fund's semi-annual report as having a value of approximately $342,000 as of 2/29/2020. In fact, the index never actually exceeded the real lower bound of 3,849.97, the position never accrued any payout, and it expired worthless in June 2020.

111.    Velissaris made these changes to the Underlying Valuation Code frequently for positions where the changes increased the value of positions and infrequently for positions where they would have decreased the value of positions.

112.    Velissaris acted knowingly or recklessly in connection with the conduct set forth above.

### 2.   Alterations to Annualization Factors

113.    Velissaris also knowingly or recklessly edited Underlying Valuation Code to improperly alter the "annualization factor" for certain OTC derivatives.

114.    Generally, an annualization factor is a standard convention for multiplying variance by the number of business days in an index's underlying calendar year. For a U.S.-based calendar, term sheets typically use an annualization factor or "scaling factor" of 252 days,

corresponding to the number of business days in a year.[4]

115.    In numerous instances for both the Mutual Fund and Private Fund, Velissaris altered the default 252-day annualization factor, including to change the annualization factors such that they were coded as being greater than 365 days—an impossibility—and even as high as 430 days.

116.    As a result of Velissaris's changes to the annualization factors, the valuation models did not reflect the actual terms of the transactions. For positions that have a positive value, increasing the annualization factor will inflate the amount of variance and the value of the position will also be improperly increased.

117.    Velissaris made these code changes frequently for positions where the changes increased the value of positions and infrequently for positions where they would have decreased the value of positions.

118.    Velissaris acted knowingly or recklessly in connection with the conduct set forth above.

### 3.  Alterations to Correlation Strike Prices

119.    Velissaris also knowingly or recklessly edited Underlying Valuation Code to improperly alter the strike price for certain correlation swaps (as well as for other swaps held by the Infinity Q Funds).

120.    In a correlation swap, payment to or from a counterparty is based on the realized correlation between each pair of underlying reference assets listed in the swap's description, from effective date until termination date. To calculate the payout for a correlation swap, the

---

[4] Other regions may vary by a few days from 252, depending on holidays.

notional amount of the swap (a reference amount agreed between the parties) is multiplied by the amount of realized correlation minus the strike price. For a long correlation swap, if the amount of correlation exceeds the strike, the position has a positive payout. For a short correlation swap, if the amount of correlation exceeds the strike, the position has a negative payout. For example, a correlation swap with a notional amount of $100,000 that had realized correlation of 0.5 and a strike price of .25 would be worth $25,000 ($100,000 * (.5-.25) = $25,000) for the party holding the long position at the termination date; the party holding the short position would owe $25,000.

121.    For at least two dozen correlation swaps as of December 2020, Velissaris modified the Underlying Valuation Code such that the strike price used for valuation purposes was "shifted," that is increased or decreased by a certain amount, which had the effect of inflating the valuation of the swaps held by the Infinity Q Funds.

122.    The result of these changes was to improperly increase the value of the positions, which again resulted in valuation models that did not reflect the actual terms of the transactions.

123.    Velissaris made these changes to the Underlying Valuation Code frequently for positions where the changes increased the value of positions and infrequently for positions where they would have decreased the value of positions.

124.    Velissaris acted knowingly or recklessly in connection with the conduct set forth above.

### B.  Velissaris Entered Incorrect Inputs into the Pricing Service

125.    Velissaris personally entered the terms of Infinity Q's OTC derivative positons into the Pricing Service with virtually no oversight or contemporaneous record.

126.    As reflected in the Pricing Service's audit trail, Velissaris regularly altered the terms of positions held by the Infinity Q Funds that he had previously loaded into the Pricing

Service. Velissaris's updates included making changes to positions' notional values, effective dates, and expiration dates after the positions were initially loaded.

127.    At times, Velissaris knowingly or recklessly inputted transaction terms that did not match the terms of the position's term sheet.

128.    For example, a certain variance swap trade that referenced the iShares MSCI EAFE ETF with a strike price of 18.4%, an effective date of 3/15/19, and a termination date of 12/17/21, was equally allocated to the Mutual Fund and the Private Fund portfolios in the Pricing Service. This position was altered hundreds of times by Velissaris in the Mutual Fund's portfolio in the Pricing Service, including three different changes to its effective date (3/15/19 changed to 12/17/19; then changed to 2/27/20; then changed to 3/14/19). The same position allocated to the Private Fund was altered at least a dozen times by Velissaris in the Pricing Service, including two changes to its effective date after being loaded with an incorrect effective date (3/14/19 changed to 12/13/19; then changed to 3/14/19).

129.    Similarly, a certain variance swap that referenced the Russell 2000 index with a strike price of 22.40%, was added to the Mutual Fund's portfolio in the Pricing Service with an effective date of February 18, 2020, rather than the correct December 18, 2020 effective date. The position was valued by Infinity Q as being worth more than $13 million in May and June 2020 and more than $15 million in July 2020; when the incorrect entry was reversed and the correct date was entered, the value of the position was reduced to approximately $5 million as of the end of August 2020.

130.    As the terms of any position should have been inputted in accordance with the position's term sheet when initially loaded, any changes or updates would be inappropriate unless the terms of the underlying agreement had also changed (which was not the case for the

positions discussed above).

131.     Velissaris acted knowingly or recklessly in connection with the conduct set forth

above.

### C.   Velissaris Chose Improper Models in the Pricing Service

132.     Velissaris also selected improper models to value OTC derivative positions held

by the Infinity Q Funds, which inflated the value of those positions.

133.     In June 2019, a representative of the Pricing Service Company informed

Velissaris by email that the Pricing Service had "several new and approved" standard models to

value swaps, including a model specifically for corridor variance swaps named "Corridor

Varswap." The representative stated that Infinity Q should "use these going forward." In other

words, Velissaris was supposed to stop using the Custom Models that he had been using to price

the corridor variance swaps held by the Infinity Q Funds. But these new standard models

included a feature that would frustrate Velissaris's scheme: The Underlying Valuation Code

could not be edited by Velissaris.

134.     After receiving this email, Velissaris used the new corridor variance swap model

in some instances. However, he primarily continued to utilize and manipulate the Custom

Models, for which he had the ability to alter the Underlying Valuation Code, to value existing

and new corridor variance swaps.

135.     For certain corridor variance swap positions, Velissaris went so far as to select

models for a "vanilla" variance swap to value the corridor variance swap. Because a vanilla

variance swap does not have corridor limitations to its payout, the vanilla model did not have the

ability to take the corridors into account.

136.     For example, as of November 30, 2020, Velissaris used the correct "Corridor

Varswap" model to value 24 corridor variance swaps held by the Mutual Fund; however, at the same time, Velissaris used Custom Models to value 78 other corridor variance swaps held by the Mutual Fund, "vanilla" variance swap models to value 19 corridor variance swaps held by the Mutual Fund, and other improper models to value an additional 35 corridor variance swaps held by the Mutual Fund.

137.     As a result of Velissaris's improper model selections, the value of positions were inflated.

138.     Velissaris acted knowingly or recklessly in connection with the conduct set forth above.

### D. Velissaris Cherry-Picked Model Assumptions

139.     Velissaris also inflated the value of the Infinity Q Funds by cherry-picking implied volatility—a key input for valuing volatility or variance swaps, which constituted a significant percentage of the holdings of the Infinity Q Funds.

140.     At inception and prior to the effective date of a position, the value of a vanilla variance swap is primarily derived from the calculation of implied volatility. Within the Pricing Service models, implied volatility is derived from volatility surfaces. The volatility surfaces are generated by the Pricing Service based on estimates of observed and simulated option prices for options of various maturities and strike prices.

141.     Over time, the value of a position is increasingly derived from the realized, or actual, volatility once the effective date of the position has occurred and realized volatility begins to accrue. Realized volatility is calculated based on the returns of the underlying index or security and increases as a percentage of the market value of a position as time passes.

142.     As Infinity Q stated in the Mutual Fund's 2020 annual report, "[a] significant

change in implied volatility could have a significant impact on the value of a position."

143.    Infinity Q's contract with the Pricing Service granted it access to market data, which included as many as 90 different volatility surfaces that could be used to price individual positions. These different volatility surfaces contained hourly snapshots of option prices (*e.g.*, New York 2:00 p.m.; New York 3:00 p.m.; New York 4:00 p.m.; London 2:00 p.m.; London 3:00 p.m.; London 4:00 p.m., etc.) that were used to derive the implied volatility input.

144.    Velissaris could and did select among the volatility surfaces via a pull-down menu within a Pricing Service interface for each position (*i.e.*, this was not a change the user would make to the Underlying Valuation Code).

145.    Velissaris used this virtually unfettered ability to make and change such selections to cherry-pick volatility surfaces, which inflated the value of the Funds.

146.    The cherry-picking manifested itself in Velissaris making inconsistent volatility surface selections for similarly situated positions, which had the effect of inflating the value of the Funds.

147.    For any two positions that reference the same underlying index and that have the same or a similar maturity date, the volatility surface selection should be the same regardless of whether Infinity Q was long or short in the position.

148.    However, in a number of instances, it appears that Velissaris selected different volatility surfaces depending on whether the positions were long or short. For example, the Mutual Fund held two variance swaps that referenced the SX5E index, each with a maturity date of 12/18/2020. As of August 31, 2020, however, the short position used a London 4:00 p.m. volatility surface and the long position used a London 10:00 a.m. volatility surface.

149.    Such inconsistent selections were made by Velissaris in order to improperly affect

the valuations of the positions to the Infinity Q Funds' benefit.

150.    Velissaris acted knowingly or recklessly in connection with the conduct set forth above.

### E.  In Real Time, Velissaris Knew That He Was Massively Overvaluing Positions

151.    Velissaris knew or at least was reckless and should have known that his changes to the valuation code, entry of incorrect terms, selection of improper models, and cherry-picking of volatility surfaces led to a massive and material overvaluation of each of the Infinity Q Funds by hundreds of millions of dollars. *See infra* Tables 1 & 2.

152.    Velissaris's manipulation of the Pricing Service generally increased in conjunction with various reporting deadlines of the Infinity Q Funds. As Velissaris explained to the CCO in an August 2018 communication, which coincided with the Mutual Fund's fiscal year-end: "I have to tighten all of [the Pricing Service] this week . . . So there will be some larger than normal moves."

153.    Velissaris further ignored numerous red flags indicating that his valuations were inappropriate, as alleged below.

#### 1.  Disparate Marks between Infinity Q Funds

154.    Infinity Q's disparate valuations of the same position allocated to the Mutual Fund and the Private Fund are indicative of Velissaris's mismarking.

155.    Generally, Velissaris would negotiate a single variance swap trade with one of Infinity Q's counterparties, and upon the confirmation of the trade Velissaris would allocate a portion of the single trade to the Mutual Fund and a portion to the Private Fund.

156.    Accordingly, in Infinity Q's compliance manual, Private Fund PPMs, and standard Due Diligence Questionnaire—which was disseminated to potential investors in the

Mutual Fund and the Private Fund, counterparties, and others—Infinity Q represented that "[o]nce a price is established for a portfolio security, it shall be used for all Funds that hold the security."

157.    In fact, the Mutual Fund (which was required to strike a NAV on a daily basis) and the Private Fund (where the financial results were calculated on a monthly basis) had widely disparate marks for some of the same overlapping positions on the same valuation date.

158.    For example, a variance swap trade that referenced the iShares MSCI EAFE ETF, with a strike price of 18.4%, an effective date of 3/15/19, and a termination date of 12/17/21, discussed *supra* ⁋ 128, was equally allocated to the Mutual Fund and the Private Fund; however, this trade was marked at approximately $8.5 million in the Mutual Fund and approximately $10.7 million in the Private Fund each at end of November 2020. The disparate valuation of this position between the Infinity Q Funds was contrary to the representations made to investors in the Private Fund PPMs and the Funds' Due Diligence Questionnaire and was contrary to Infinity Q's compliance manual.

159.    These differences were generally a result of Velissaris's manipulations within the Pricing Service, as the positions were loaded in separate portfolios in the Pricing Service for the two Infinity Q Funds.

160.    Velissaris did not follow the policy that "[o]nce a price is established for a portfolio security, it shall be used for all Funds that hold the security."

161.    Velissaris acted knowingly or recklessly in connection with the conduct set forth above.

### 2.  Mathematically Impossible Valuations

162.    As a registered investment company, the Mutual Fund was required to report

information about its portfolio holdings to the SEC, which here were available to the public on

the EDGAR system (EDGAR, the Electronic Data Gathering, Analysis, and Retrieval system,

performs automated collection, validation, indexing, acceptance, and forwarding of submissions

by companies and others who are required by law to file forms with the SEC).

163.    Certain positions reported by the Mutual Fund were reported at mathematically

impossible valuations, among other problems and inconsistencies.

164.    Generally, the potential gain on a vanilla volatility or variance swap is inherently

limited for the party holding the short position because the realized volatility metric cannot be

less than zero. Market volatility is the magnitude or range of price change in a given period of

time. In a hypothetical scenario, it may be zero if the price of the referenced asset or index does

not change over time, but it cannot be negative.

165.    Infinity Q, however, reported multiple swaps in the Mutual Fund's EDGAR

filings that appear to have been valued assuming that volatility would be negative, and, thus, the

reported gain by the Mutual Fund was higher than the maximum possible payout (or the reported

amount was less of a loss than the minimum amount of loss).

166.    For example, in the Mutual Fund's February 29, 2020 semi-annual report, the

Mutual Fund reported two short MXWO variance swaps, one with an effective date of 3/15/19

(marked at over $5.6 million) and the other with an effective date of 3/18/19 (marked at over

$2.8 million). These valuations for the two positions were mathematically impossible because

they required that the implied volatility metric be less than zero, an impossibility.

167.    By at least May 2020, Velissaris was made aware of these and other reporting

problems in the Mutual Fund's EDGAR filings.

168.    Velissaris acted knowingly or recklessly in connection with the conduct set forth

above.

### 3.  Divergent Counterparty Marks, Margin Call Disputes, and Settlements

169.    <u>Divergent Counterparty Marks</u>. The divergent valuations of these same OTC derivative positions by Infinity Q's swap counterparties, which were known to Velissaris, is a further indication of Infinity Q's mismarking.

170.    Infinity Q and Velissaris were aware that certain of the Infinity Q Funds' counterparties were ascribing vastly different marks from Infinity Q to the same positions. For example, in December 2019 the CCO undertook to compare (i) the end-of-day position values for the Mutual Fund and the Private Fund, obtained from the daily margin reports received from a certain counterparty, with (ii) the marks of the Infinity Q Funds. The CCO emailed Velissaris that the marks sourced from the counterparty's margin reports "differ from [the Pricing Service] substantially. Please have a look."

171.    <u>Margin Calls</u>. Velissaris was also aware of tens of millions of dollars of margin calls from Infinity Q's counterparties related to their divergent valuations of the OTC derivative positions at issue. Generally, the agreements between the Infinity Q Funds and their counterparties provided that the counterparties could issue "margin calls" if the market value of a position fell below a certain amount. Generally, margin calls can occur when a counterparty to a particular swap trade is able to demand additional cash from Infinity Q when they determine the value of a particular swap trade decreased. When notified of a margin call by a counterparty, Infinity Q was required to post additional margin.

172.    In March 2020, the Infinity Q Funds were faced with increased market volatility caused by the COVID-19 pandemic.

173.    Beginning in at least March 2020, Infinity Q and multiple of its counterparties

engaged in extensive discussions regarding margin call disputes after the counterparties requested tens of millions of dollars of additional margin from the Infinity Q Funds related to the OTC derivative positions at issue. These margin calls were based on counterparty marks that showed the positions were losing value, and which Infinity Q admitted were substantially different from its own marks.

174.    Velissaris acknowledged that the Infinity Q Funds' and their counterparties had widely different marks for the OTC derivative positions at issue. For example, on March 13, 2020, Velissaris sent the CCO a communication instructing, "[i]n an environment like this, I want to partially dispute big [margin] calls," but acknowledging "[o]ur value deviates from theirs by 3-7mm [million] per line item."

175.    Even after the March 2020 market volatility event, the disparate marks persisted. For example, Infinity Q and one of its counterparties entered into multiple "up" corridor variance swaps referencing the U.S.'s Russell 2000 Index ("RTY") (that is, the position only accrued variance when the reference index remained above a certain amount). Infinity Q reported these positions as having unrealized positive valuations of $15,820,432 and $15,725,293 for Infinity Q as of May 31, 2020, whereas those same positions were marked by the counterparty as having unrealized positive valuations of only $71,968 and $65,726, respectively, for Infinity Q as of June 1, 2020. Similarly, the Mutual Fund's public filings show an unrealized loss of ($4,682,520) for Infinity Q as of May 31, 2020, for an RTY variance swap with a June 19, 2020, maturity date; the counterparty marked this position as having an unrealized loss for Infinity Q of ($15,613,979) as of June 1, 2020.

176.    Settlements. In addition, certain positions that Infinity Q valued as having a positive value just days before their termination date expired worthless or at significantly lower

values than Velissaris generated through the Pricing Service. For example, in July 2020 Velissaris approved the settlement of a certain correlation swap that expired on July 7, 2020, despite being informed by the CCO that the "settlement amount is [$]430k worse than yesterday's [Pricing Service valuation]."

177.    As a result, in order to conceal the losses (*i.e.*, between the marked values and settlement values when positions matured), Velissaris added new OTC derivative positions and inflated the valuations as alleged above.

178.    Velissaris acted knowingly or recklessly in connection with the conduct set forth above.

### F. Scope of the Mismarking

179.    In 2016, Velissaris began using the Pricing Service, and by at least February 2017, Velissaris was knowingly manipulating the Pricing Service in order to inflate the values of the positions held by the Mutual Fund and the Private Fund.

180.    Separate re-valuations of the historical positions held by the Mutual Fund and the positions held by the Private Fund were conducted by two third-party valuation firms (retained by the Board and Infinity Q's new management, respectively). According to those findings, Velissaris mismarked the Mutual Fund's and the Private Fund's positions by more than $1 billion dollars combined as of the end of September 2020.

181.    The mismarking over time in the Mutual Fund was material. The mismarking is reflected in the table below, based on a third-party valuation firm's recalculation of the Mutual Fund's month-end NAV. As reflected in Table 1, at times the Mutual Fund was more than 42% overvalued.

**Table 1: Recalculated Mutual Fund NAV**

| Month End | IQ Reported Mutual Fund NAV | Recalculated Mutual Fund NAV | Difference | Percent Overvalued |
|---|---|---|---|---|
| 3/31/2017 | $156,433,465 | $150,494,337 | ($5,939,128) | 3.80% |
| 6/30/2017 | $159,886,216 | $150,863,386 | ($9,022,830) | 5.64% |
| 9/30/2017 | $165,306,959 | $159,481,674 | ($5,825,285) | 3.52% |
| 12/31/2017 | $173,098,348 | $170,922,508 | ($2,175,841) | 1.26% |
| 3/31/2018 | $210,240,557 | $207,624,579 | ($2,615,978) | 1.24% |
| 6/30/2018 | $234,320,148 | $226,903,459 | ($7,416,689) | 3.17% |
| 9/30/2018 | $310,450,929 | $305,244,214 | ($5,206,715) | 1.68% |
| 12/31/2018 | $428,724,464 | $407,733,741 | ($20,990,723) | 4.90% |
| 3/31/2019 | $549,812,778 | $522,587,676 | ($27,225,102) | 4.95% |
| 6/30/2019 | $626,243,979 | $577,016,402 | ($49,227,576) | 7.86% |
| 9/30/2019 | $702,332,704 | $637,903,976 | ($64,428,728) | 9.17% |
| 12/31/2019 | $770,265,076 | $675,803,617 | ($94,461,458) | 12.26% |
| 3/31/2020 | $1,051,949,041 | $604,102,066 | ($447,846,975) | 42.57% |
| 6/30/2020 | $1,367,755,693 | $871,450,690 | ($496,305,004) | 36.29% |
| 9/30/2020 | $1,634,510,959 | $1,142,723,614 | ($491,787,344) | 30.09% |
| 12/31/2020 | $1,807,630,993 | $1,396,584,503 | ($411,046,490) | 22.74% |
| 2/18/2021 | $1,727,194,949 | $1,334,262,392 | ($392,932,557) | 22.75% |

182.    The mismarking over time in the Private Fund was material. The mismarking is reflected in the table below, based on a third-party valuation firm's recalculation of the Private Fund's month-end total assets. As reflected in Table 2, at times the Private Fund was more than 137% overvalued.

**Table 2: Recalculated Private Fund Total Assets**

| Month End | IQ Reported Private Fund Assets | Recalculated Private Fund Assets | Difference | Percent Overvalued |
|---|---|---|---|---|
| 3/31/2017 | $15,804,643 | $15,073,573 | ($731,070) | 4.85% |
| 6/30/2017 | $22,329,236 | $21,424,835 | ($904,401) | 4.22% |
| 9/30/2017 | $25,374,163 | $22,209,342 | ($3,164,821) | 14.25% |
| 12/31/2017 | $25,997,988 | $21,604,391 | ($4,393,596) | 20.34% |
| 3/31/2018 | $61,234,674 | $54,262,369 | ($6,972,305) | 12.85% |
| 6/30/2018 | $64,872,235 | $54,978,327 | ($9,893,907) | 18.00% |

| 9/30/2018 | $142,796,073 | $131,803,572 | ($10,992,501) | 8.34% |
|---|---|---|---|---|
| 12/31/2018 | $199,931,440 | $178,721,393 | ($21,210,047) | 11.87% |
| 3/31/2019 | $254,842,728 | $221,705,632 | ($33,137,096) | 14.95% |
| 6/30/2019 | $351,156,337 | $292,807,701 | ($58,348,636) | 19.93% |
| 9/30/2019 | $401,002,746 | $328,179,700 | ($72,823,045) | 22.19% |
| 12/31/2019 | $739,891,190 | $635,995,332 | ($103,895,858) | 16.34% |
| 3/31/2020 | $894,138,173 | $377,048,061 | ($517,090,112) | 137.14% |
| 6/30/2020 | $1,088,347,495 | $584,142,466 | ($504,205,029) | 86.32% |
| 9/30/2020 | $1,136,106,710 | $618,013,331 | ($518,093,379) | 83.83% |
| 12/31/2020 | $1,183,716,570 | $697,707,143 | ($486,009,427) | 69.66% |
| 1/31/2021 | $1,224,776,684 | $737,038,694 | ($487,737,990) | 66.18% |

183.    The Infinity Q Funds' marketing materials claimed that its "risk managed investment approach" could "*underperform* equity benchmarks during bull markets," but its volatility investment strategy "seeks to offer protection during volatile market environments" and, thus, "may *outperform* during global equity market sell-offs" (emphasis in original).

184.    In fact, as a result of Velissaris's overvaluation of the portfolio, Infinity Q reported strong (albeit fake) returns in all markets.

185.    As of the end of March 2020, as a result of Velissaris's mismarking, Infinity Q reported year-to-date returns for institutional class shares in the Mutual Fund of 8.95%, one-year returns of 10.61%, three-year returns of 8.72%, and five-year returns of 7.28%. By contrast, the hedge fund index to which Infinity Q compared itself (*i.e.*, its benchmark) reported year-to-date returns of *negative* 8.98% (that is, a loss of 8.98%), one-year returns of *negative* 4.32%, three-year returns of 0.36%, and five-year returns of 0.24%.

186.    As of the end of March 2020, as a result of Velissaris's mismarking, Infinity Q reported year-to-date returns in the Private Fund of 5.63%, one-year returns of 17.57%, and two-year returns of 18.35%. By contrast, the hedge fund index that Infinity Q compared itself to reported year-to-date returns of *negative* 8.98%, one-year returns of *negative* 4.32%, and two-

year returns of *negative* 2.09%.

187.    The Mutual Fund grew steadily in the first few years from its launch in 2014, from a reported NAV of $173 million at the end of 2017, to $428 million at the end of 2018, and to $770 million at the end of 2019.

188.    Similarly, the Private Fund, launched in 2017, also grew steadily from a reported total assets of $25 million at the end of 2017, to $199 million at the end of 2018, and to $739 million at the end of 2019.

189.    By the end of 2020, the Mutual Fund's reported NAV had more than doubled to $1.8 billion, and the Private Fund's reported total assets had increased by more than $440 million to $1.183 billion.

190.    On February 18, 2021, the day before the Mutual Fund suspended redemptions, its reported NAV was approximately $1.727 billion.[5] The Private Fund reported approximately $1.224 billion of total assets as of January 31, 2021.

**G.  Velissaris Mismarked Positions to Attract Subscriptions, Forestall Redemptions, and Enrich Himself and Infinity Q**

191.    Velissaris's knowing manipulation of the Infinity Q Funds' OTC derivative positions in the Pricing Service led to Infinity Q Funds' reporting illusory performance, which resulted in additional subscriptions and significant additional fees to Infinity Q and to Velissaris.

192.    Velissaris's mismarking was at all times material and greatly increased after the March 2020 market volatility event related to the COVID-19 pandemic.

193.    During this time period, while multiple competitors of Infinity Q failed or

---

[5] The Mutual Fund had been closed to new investment since December 31, 2020, due to the identification of certain variance swap valuation issues related to the SEC's investigation.

struggled, the Mutual Fund and Private Fund faced tens of millions of dollars of margin calls concerning OTC derivative positions that were losing value, and the Infinity Q Funds began to run out of cash. *See supra* Section III.E.3.

194.    On March 13, 2020, Velissaris admitted to the CCO in a communication that "we just didn't structure the book optimally for a scenario like this."

195.    Velissaris, concerned about the ability of the Infinity Q Funds to continue, initially tried to obtain a $100 million loan from affiliates of its partial owner in order to meet tens of millions of dollars of margin calls from multiple Infinity Q counterparties.

196.    On March 18, 2020, the CCO sent a communication to Velissaris regarding the proposed loan and asked: "[H]ow much do we need . . . in your opinion[?]" Velissaris immediately responded: "100 mm," meaning $100 million.

197.    In response to the CCO's inquiry, Velissaris further replied that Infinity Q's business development employee was "pushing to get [$]120 [million] in the door on 4/1" as an alternative.

198.    On March 23, 2020, Velissaris sent the CCO a communication regarding the ongoing margin calls and dire cash situation, and stated: "The problem is we don't have enough cash to do more than 30-40 mm [million] i[n] settlements in day."

199.    The $100 million loan did not materialize, and Velissaris increased his mismarking to attract additional investor inflows and forestall investor redemptions.

200.    The mismarking allowed the Infinity Q Funds to attract hundreds of millions of dollars of additional funds from investors. These funds helped the Mutual Fund and Private Fund survive tens of millions of dollars of margin calls, which threatened to cause Infinity Q to fail.

201.    Velissaris's mismarking, in turn, caused the Infinity Q Funds to pay excess

management and performance fees to Infinity Q.

202.    Both the Mutual Fund and the Private Fund paid Infinity Q management fees based on the entities' respective assets under management, and the Private Fund paid Infinity Q performance fees as a percentage of the fund's annual returns.

203.    Profits from these excessive management and performance fees were distributed to Infinity Qs owners including Infinity Q Management Equity, which was majority owned by Velissaris.

### H.  Misrepresentation of Performance and Other Information to Investors and the Board

204.    In addition to the misrepresentations alleged above concerning valuation policies, Infinity Q and Velissaris also knowingly disseminated false and misleading information about the Infinity Q Funds' NAV or total assets, performance, and the terms of investment to current and prospective investors and the Board. For example, from at least 2017, Infinity Q and Velissaris marketed the Mutual Fund and, later, the Private Fund, by creating and disseminating marketing materials, fact sheets, presentations, and risk reports that were sent to prospective investors touting the inflated values as alleged above.

205.    These marketing materials also conspicuously displayed tables and charts reflecting the Mutual Fund's and the Private Fund's inflated quarterly and/or monthly track-record of returns and purported outperformance of certain benchmark indices.

206.    The inflated performance was also touted in Infinity Q's letter to investors at the beginning of the Mutual Fund's annual report.

207.    Infinity Q also provided the Mutual Fund's and the Private Fund's investors and the Board with materially misstated audited financial statements for at least the years ended August 31, 2019 and 2020, for the Mutual Fund, and December 31, 2019, for the Private Fund.

44

208.    Infinity Q also disseminated Private Fund PPMs containing misrepresentations regarding its valuation policy and, later, the valuation policy Velissaris had altered to mislead the SEC, as further alleged below.

209.    Velissaris acted knowingly or recklessly in connection with the conduct set forth above.

## IV.    Attempts to Conceal the Mismarking Scheme

### A.   Velissaris's Attempts to Mislead the Auditor

210.    Velissaris altered key documents in an attempt to mislead the Auditor about certain positions selected for re-valuation by the Auditor's third-party valuation expert.

211.    In connection with the Mutual Fund's 2020 year-end audit, as part of its testing procedures, the Auditor selected a certain corridor variance swap position to be revalued by an independent valuation expert. The selected position was a corridor variance swap that referenced the SX5E index with an effective date of 2/4/20 and a termination date of 12/18/20, which was reported as having a value of more than $22 million in the Mutual Fund's annual report. Velissaris had manipulated the Underlying Valuation Code for this position such that the corridors were not being properly taken into consideration in the Mutual Fund's valuation.

212.    Velissaris was informed of the selection of this position for independent valuation in an email from the Auditor on the morning of Friday, September 18, 2020.

213.    Velissaris, in order to conceal the mismarking of this position, then edited the term sheet for the position by deleting the actual lower corridor and replacing it with a reduced lower corridor, such that in the new, forged version of the term sheet, the index would have been within the corridor for almost the entire life of the position.

214.    Infinity Q had previously uploaded this position's term sheet to the Auditor's client portal. Upon learning of the selection, Velissaris instructed other individuals at Infinity Q

to remove the original term sheet for the position and upload in its place Velissaris's forged

version of the term sheet (in the format of a .pdf file).

215.    Also on September 18, 2020, after the original term sheet was replaced with the

altered term sheet, Velissaris emailed the Auditor: "We noticed several [term sheets] that needed

to be updated. [Infinity Q employees] just updated and the current files should be correct."

216.    The Auditor then provided the altered version of the term sheet to their valuation

expert who was thus able to calculate a valuation close to Infinity Q's for that position.

217.    Based on the recent re-valuation of this position by a third-party valuation firm

retained by the Board, which was based on the actual term sheet, the value of the position as of

8/31/2020 was, in fact, only $4.569 million, not more than $22 million as valued by Infinity Q.

In December 2020, the realized value of the position at settlement was only approximately $4

million.

218.    According to the Pricing Service audit log, Velissaris also updated and repriced

this position in the Pricing Service on Monday, September 21, 2020.

219.    In February 2021, Velissaris engaged in similar conduct in connection with the

Private Fund's 2020 year-end audit. For example, the Auditor selected for independent re-

valuation another corridor variance swap position, which referenced the SX5E index with a

1/10/20 effective date and 12/17/20 termination date to be re-valued by an independent valuation

expert.

220.    Infinity Q had previously uploaded this position's term sheet to the Auditor's

client portal. Upon learning of the selection, Velissaris himself deleted the original term sheet for

the position from the Auditor's client portal. Velissaris once again edited the term sheet for the

position by deleting the actual lower bound for the position and replacing it with a reduced lower

bound. According to the Auditor's audit log for the client portal, Velissaris himself then uploaded the new, forged term sheet (in the form of a .pdf file) to the Auditor's client portal.

221.    The Auditor noticed that new versions of term sheets had been uploaded to the client portal and wrote to Velissaris: "I noticed that the trade confirms that were originally provided on our Client Portal were deleted and replaced with new versions yesterday. Just wanted to check with you to see if there were any issues with the trade confirms that were deleted?"

222.    In response, Velissaris did not disclose that he had removed the correct term sheet and replaced it with a forged term sheet. Instead, Velissaris replied: "We were finalizing our review and wanted to make sure the final versions were uploaded."

223.    Velissaris submitted the forged term sheet with a reduced lower bound to the Auditor because he had previously manipulated the Underlying Valuation Code for this very position, as alleged above. As alleged above, Velissaris had coded an additional "-2650" to the lower corridor in the Underlying Valuation Code, which meant that the valuation would effectively disregard the lower corridor. If the Auditor had received the actual term sheet, its valuation expert would have arrived at a much different valuation than Infinity Q.

224.    Velissaris acted knowingly or recklessly out of a concern that, if the Auditor properly tested these positions, his scheme may have been uncovered.

        **B.  Velissaris's Attempts to Mislead the SEC**

225.    During the SEC's investigation, Velissaris also attempted to mislead the SEC about his use of the Pricing Service to value the positions at issue.

226.    In response to the SEC's initial requests for valuation policies and procedures and offering materials in May 2020, Velissaris did not produce the documents that had been sent to

investors by Infinity Q. Instead, Velissaris edited the valuation policy sections of the policies and procedures and PPMs, while keeping the as-of dates on the documents and without indicating that he had made changes. Velissaris's edits placed additional emphasis on Infinity Q's use of the Pricing Service (while not disclosing his control and active manipulation of its models) and eliminated the role of counterparty marks and broker quotes, which were widely divergent from Infinity Q's marks, in the valuation process. Velissaris also removed the provision that "[o]nce a price is established for a portfolio security, it shall be used for all Funds that hold the security."

227.    In response to a subsequent request by the SEC for valuation committee minutes, Velissaris drafted and backdated committee minutes for meetings that had not occurred and submitted them to the staff without indicating he had recently created the minutes.

228.    The SEC staff interviewed Velissaris on two occasions in November 2020. Despite multiple questions posed to Velissaris during the two interviews about how he valued positions and his use of the Pricing Service, Velissaris did not tell the SEC staff that he could and did change the Underlying Valuation Code in the Pricing Service, that he selected models that were not appropriate for the transactions at issue, or that he entered terms into the Pricing Service that differed from actual terms sheets.

229.    In connection with the second interview, Infinity Q also produced to the SEC what purported to be screenshots of the standard and custom models it was using in the Pricing Service to value certain positions identified by the SEC staff. These screenshots, however, were only of the Pricing Service's User Interface and, thus, included the fields that showed the terms of the transactions that Velissaris entered into the model. These screenshots misleadingly omitted the Underlying Valuation Code, which would have revealed that the position was actually being valued using terms that differed from the terms reflected in the User Interface. For a certain

corridor variance swap position, the terms of the corridors as reflected in the screenshots submitted to the SEC staff were different from what were actually being used in calculation by the Underlying Valuation Code. In fact, Velissaris had altered the Underlying Valuation code to disregard the corridors.

230.   On February 11, 2021, after obtaining read-only access to the Infinity Q Funds' portfolios from the Pricing Service, SEC staff informed Infinity Q's counsel that it had identified certain changes made by Velissaris to the Underlying Valuation Code for positions held by the Infinity Q Funds.

231.   In February 2021, when Velissaris knew his scheme was about to be discovered, he took an unprecedented profits distribution from Infinity Q. On February 11, 2021, Velissaris effectively transferred to Infinity Q Management Equity, which Velissaris controlled, $7.2 million in fees that had been generated from the inflated valuations of the Mutual Fund and Private Fund. In the days preceding the distribution, Velissaris forged and then submitted term sheets to the Auditor, in an attempt to mislead the Auditor about certain positions selected for re-valuation by the Auditor's third-party valuation expert, as alleged *supra*. On February 8, Velissaris was also informed by a representative of the Board that they had been asked by the Auditor to "test that the inputs for the models in [the Pricing Service] match the term sheets across a sampling of positions," and to "represent that we have also tested and not found any exceptions," which Velissaris tried to resist. The February 2021 distribution came as a surprise to others at Infinity Q, and it was the first time that Velissaris had ever effected a distribution in the month of February.

232.   On February 12, 2021, Infinity Q's counsel told SEC staff for the first time that Infinity Q could view and change the Underlying Valuation Code. Infinity Q's counsel further

stated that, from its understanding: (a) changes were made to positions as part of a normal daily process; (b) it was believed that Velissaris made the changes; (c) the changes did not have a material impact on valuations; and (d) Infinity Q was putting into place remediation around code changes.

233.    On February 18, 2021, SEC staff were informed by Velissaris's personal counsel that his client did in fact make alterations to the Underlying Valuation Code used to value Infinity Q's corridor variance swaps. According to Velissaris's counsel, Velissaris made such changes in order to achieve a valuation his client thought appropriate.

234.    On February 19, 2021, Infinity Q's counsel informed SEC staff that Infinity Q had identified that Velissaris was trying to make an unauthorized change in the Pricing Service to the Infinity Q Funds' portfolios.

235.    On February 19, 2021, Infinity Q revoked Velissaris's ability to access the Pricing Service.

236.    On February 22, 2021, the SEC approved Infinity Q's application to suspend redemptions in the Mutual Fund. In that application, Infinity Q and the Board stated:

> Based on information learned by the Commission staff and shared with Infinity Q, Infinity Q informed the [Mutual] Fund that Infinity Q's Chief Investment Officer had been adjusting certain parameters within the third-party pricing model that affected the valuation of the Swaps. Applicants state that on February 19, 2021, Infinity Q informed the [Mutual] Fund that at such time it was unable to conclude that these adjustments were reasonable, and, further, that it was unable to verify that the values it had previously determined for the Swaps were reflective of fair value. Applicants state further that Infinity Q also informed the [Mutual] Fund that it would not be able to calculate a fair value for any of the Swaps in sufficient time to calculate an accurate NAV for at least several days.

237.    Velissaris acted knowingly or recklessly in connection with the conduct set forth above.

## V.     Velissaris's Criminal Conviction

238.    On February 17, 2022, the U.S. Attorney's Office for the Southern District of

New York unsealed an indictment against Velissaris for his role in the mismarking scheme

affecting the Infinity Q Funds. *United States v. Velissaris*, 22 cr. 105 (S.D.N.Y.) (DLC).

239.    On November 21, 2022, Velissaris pleaded guilty to one count of securities fraud

in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. At his plea

hearing, Velissaris admitted to his conduct in an allocution under oath, including as follows:

> "I made false statements of material fact to investors in the Infinity Q funds that I
> managed, and I did so knowingly, willfully, and with the intent to defraud.
> Specifically, I told investors that I was using an independent Bloomberg system to
> value the fund's over-the-counter derivatives. However, I was making manual
> adjustments in the system which increased the values of over-the-counter derivative
> positions that were reported. I knew that if I disclosed what I was doing, investors
> might have decided to redeem their investments or maybe would not have made the
> investments in the first place. . . . I acknowledge that my actions caused investors to
> lose money."

240.    On April 7, 2023, Velissaris was sentenced to 180 months imprisonment for his

role in the mismarking scheme.

## VI.    WPH

241.    When Infinity Q was formed in 2014, WPH provided it with $2 million in seed

capital. Between 2014 and 2019, WPH also advanced to Infinity Q approximately $10 million to

pay certain Infinity Q employee compensation and expense reimbursements and other expenses.

242.    Between 2019 and 2021, Infinity Q made distributions to WPH of $19,152,899 in

cash and $2.4 million in paid in kind shares in the Private Fund (the "PIK Shares"), for a total of

$21,552,899 in connection with WPH's ownership interest in Infinity Q. The distributions were

derived from Infinity Qs management and performance fees received from the Funds.

243.    WPH has deposited into escrow $15,650,000 into a class action settlement fund in the consolidated class action titled *In re Infinity Q Diversified Alpha Fund Securities Litigation*, Index No. 651295/2021 (N.Y. Sup.), and has relinquished its right to obtain any distribution on account of its PIK shares.

## FIRST CLAIM FOR RELIEF
### (Against Defendant Only)
### Violations of Section 17(a) of the Securities Act

244.    The SEC realleges and incorporates by reference here the allegations in paragraphs 1 through 243.

245.    By engaging in the acts and conduct described in this Complaint, Defendant, directly or indirectly, singly or in concert with others, in the offer or sale of securities and by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails: (a) knowingly or recklessly employed devices, schemes, and artifices to defraud; (b) knowingly, recklessly or negligently obtained money or property by means of untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) knowingly, recklessly, or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of such securities..

246.    By reason of the foregoing, Defendant, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
### (Against Defendant Only)
### Violations Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

247.    The SEC realleges and incorporates by reference here the allegations in

paragraphs 1 through 243.

248.   By engaging in the acts and conduct described in this Complaint, Defendant, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly (1) employed one or more devices, schemes, or artifices to defraud; (2) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (3) engaged in one or more acts, practices, or courses of business which operated or would have operated as a fraud or deceit upon other persons.

249.   By reason of the foregoing, Defendant, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**THIRD CLAIM FOR RELIEF**
**(Against Defendant Only)**
**Violations of Advisers Act Section 204(a) and Rule 204-2 Therunder**

250.   The SEC realleges and incorporates by reference here the allegations in paragrapsh 1 through 243.

251.   At all relevant times, Defendant was an investment adviser under Advisers Act Section 202(11) [15 U.S.C. § 80b-2(a)(11)].

252.   By engaging in the acts and conduct described in this Complaint, Defendant directly or indirectly, while acting as an investment adviser, by use of the mails or the means and instrumentalities of interstate commerce, (1) failed to make and keep required books and records related to Defendant's advisory business; and failed to furnish to the SEC copies of books and

records that Infinity Q was required to make, keep, and provide to representatives of the SEC upon request.

253.  By reason of the foregoing, Defendant, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Advisers act Section 204(a) [15 U.S.C. § 80-b-4(a)] and Rule 204-2 thereunder [17 C.F.R. § 275.204-2].

**FOURTH CLAIM FOR RELIEF**
**(Against Defendant Only)**
**Violations of Advisers Act Sections 206(1) and (2)**

254.  The SEC realleges and incorporates by reference here the allegations in paragraphs 1 through 243.

255.  Defendant owed the Infinity Q Funds a fiduciary duty of utmost good faith and had an affirmative duty to make full and fair disclosure of all material facts, as well as a duty to act in the fund's best interests.

256.  By engaging in the acts and conduct described in this Complaint, Defendant, directly or indirectly, singly or in concert, while acting as an investment adviser, by use of the mails or the means and instrumentalities of interstate commerce, has: (i) knowingly or recklessly employed devices, schemes, or artifices to defraud clients or prospective clients, and/or (ii) knowingly, recklessly, or negligently engaged in transactions, practices, and courses of business which operated or would have operated as a fraud or deceit upon clients or prospective clients.

257.  By reason of the foregoing, Defendant, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Advisers Act Sections 206(1) and (2) [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

### FIFTH CLAIM FOR RELIEF
### (Against Defendant Only)
### Violations of Advisers Act Section 206(4) and Rule 206(4)-7

258.  The SEC realleges and incorporates by reference here the allegations in paragraphs 1 through 243.

259.  By engaging in the acts and conduct described in this Complaint, Defendant, knowingly, recklessly, and/or negligently, provided investment advice to its clients without adopting and implementing written policies and procedures reasonably designed to prevent violation, by Defendant and Defendant's supervised persons, of the Advisers Act and the rules promulgated under the Advisers Act.

260.  By reason of the foregoing, Defendant, directly or indirectly, singly or in concert, has violated, and unless enjoined, will again violate Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-7 thereunder [17 C.F.R. § 275.206(4)-7].

### SIXTH CLAIM FOR RELIEF
### (Against Defendant Only)
### Violations of Advisers Act Section 206(4) and Rule 206(4)-8 Thereunder

261.  The SEC realleges and incorporates by reference here the allegations in paragraphs 1 through 243.

262.  Each of the Infinity Q Funds was a pooled investment vehicle within the meaning of Rule 206(4)-8(b) of the Advisers Act [17 C.F.R. § 275.206(4)-8(b)]. Each of the Funds was engaged in, held itself out as being engaged primarily, and proposed to engage itself primarily in the business of investing, reinvesting, and/or trading in securities, and thus was an investment company as defined in Section 3(a) of the Investment Company Act of 1940 [15 U.S.C. § 80a-3(a)] or would have been an investment company under that provision but for the exclusion provided from that definition under either Section 3(c)(1) or Section 3(c)(7) of the Investment

Company Act of 1940 [15 U.S.C. § 80a-3(c)(1) & (7)].

263.   By engaging in the acts and conduct described in this Complaint, Defendant, directly or indirectly, singly or in concert, while acting as an investment adviser to a pooled investment vehicle, knowingly, recklessly, or negligently (i) made an untrue statement of a material fact or omitted to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, to any investor or prospective investor in the pooled investment vehicle; and/or (ii) engaged in acts, practices, or courses of business which were fraudulent, deceptive, or manipulative, with respect to an investor or prospective investor in the pooled investment vehicle.

264.   By reason of the foregoing, Defendant, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Advisers Act Section 206(4) [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8(a) thereunder [17 C.F.R. § 275.206(4)8].

## SEVENTH CLAIM FOR RELIEF AGAINST DEFENDANT
### (Against Defendant Only)
### Violations of Advisers Act Section 207

265.   The SEC realleges and incorporates by reference here the allegations in paragraphs 1 through 243.

266.   By engaging in the acts and conduct described in this Complaint, Defendant, directly or indirectly, singly or in concert, by use of the mails, and the means and instrumentalities of interstate commerce, willfully made untrue statements of material fact in, and omitted to state material facts required to be stated in, reports required to be filed with the SEC under Section 203 of the Advisers Act. A Form ADV is a registration application or report filed with the Commission pursuant to Section 203 of the Advisers Act.

267.   By reason of the foregoing, Defendant, directly or indirectly, singly or in concert,

has violated and, unless enjoined, will again violate Advisers Act Section 207 [15 U.S.C. § 80b-7].

## EIGHTH CLAIM FOR RELIEF
### (Against Defendant Only)
### Violations of Investment Company Act Section 34(b)

268.    The SEC realleges and incorporates by reference here the allegations in paragraphs 1 through 243.

269.    The Mutual Fund is an "investment company" as defined by Section 3(a)(1) of the Investment Company Act [15 U.S.C. § 80a-3].

270.    By engaging in the acts and conduct described in this Complaint, Defendant, directly or indirectly, singly or in concert, made untrue statements of material fact in a registration statement or filing under the Investment Company Act, and/or filed, transmitted, or kept documents which omitted to state any fact necessary in order to prevent the statements made, in the light of the circumstances under which they were made, from being materially misleading.

271.    By reason of the foregoing, Defendant, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Investment Company Act Section 34(b) [15 U.S.C. § 80a-33].

## NINTH CLAIM FOR RELIEF
### (Against Defendant Only)
### Aiding and Abetting Violations of Investment Company Act Rule 22c-1

272.    The SEC realleges and incorporates by reference here the allegations in paragraphs 1 through 243.

273.    The Mutual Fund is an "investment company" as defined by Section 3(a)(1) of the Investment Company Act [15 U.S.C. § 80a-3].

274.   By engaging in the acts and conduct described in this Complaint, the Mutual Fund sold, redeemed, or repurchased its redeemable security at a price other than the price based on the current net asset value of such security that is next computed after receipt of a tender of the security for redemption or of an order to purchase or sell the security.

275.   By reason of the foregoing, Defendant, directly or indirectly, singly or in concert, aided and abetted the Mutual Fund's violations of Investment Company Act Rule 22c-1 [17 C.F.R. § 270.22c-1] by knowingly or recklessly providing substantial assistance to the Mutual Fund's violations pursuant to Section 48(b) of the Investment Company Act [15 U.S.C. § 80a-47(b)], and unless enjoined, will again aid and abet violations of this provision.

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court enter a Final Judgment:

### I.

Permanently enjoining Defendant and its agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], Sections 204(a), 206(1), 206(2), 206(4) and 207 of the Advisers Act [15 U.S.C. §§ 80b-4(a), 80b-6(1), 80b-6(2), 80b-6(4), 7 80b-6(7)], and Rules 204-2(a), 206(4)-7, and 206(4)-8 thereunder [17 C.F.R. § 275.206(4)8], and Section 34(b) of the Investment Company Act [15 U.S.C. §§ 80a-33, 80a-36], and from aiding and abetting violations of Rule 22c-1 under the Investment Company Act [17 C.F.R. § 270.22c-1];

### II.

Ordering Defendant to disgorge all ill-gotten gains it received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations;

### III.

Ordering Defendant to pay civil monetary penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)], Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)], Advisers Act Section 209(e) [15 U.S.C. § 80b-9(e)], and Investment Company Act Section 42(e) [15 U.S.C. § 80a-41(e)];

### IV.

Ordering the appointment of an independent Monitor to oversee a claims and distribution process for the Private Fund.

### V.

Ordering Relief Defendant to pay disgorgement and prejudgment interest.

### VI.

Granting any other and further relief that may be appropriate and necessary for the benefit of investors.

### **JURY DEMAND**

The SEC demands a trial by jury.

Dated: New York, New York
June 16, 2023

_____
Andrew Dean
Osman Nawaz*
Joshua Brodsky
Preethi Krishnamurthy

59

Alistaire Bambach
Neal Jacobson
Zachary Sturges
Ariana Torchin
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
100 Pearl Street
Suite 20-100
New York, New York 10004
(212) 336-0095 (Jacobson)
Email:Jacobsonn@sec.gov
*Not admitted to U.S.D.C for the S.D.N.Y.